Opinion filed December 1, 2005












 
 
  
 
 







 
 
  
 
 




Opinion filed December 1, 2005

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh Court of Appeals

                                                                   __________

 

                                                          No. 11-04-00149-CR 

 

                                                    __________

 

                                JOHN WAYNE WOODALL, Appellant

 

                                                             V.

 

                                        STATE
OF TEXAS, Appellee

 



 

                                          On
Appeal from the 91st District Court

 

                                                        Eastland
County, Texas

 

                                                Trial
Court Cause No. 03-20,060

 



 

                                                                   O
P I N I O N

 

The jury convicted John Wayne Woodall of the first
degree felony offense of manufacture of methamphetamine in the amount of 4
grams or more but less than 200 grams and the second degree felony offense of
possession of methamphetamine in the amount of 4 grams or more but less than
200 grams.  The jury assessed punishment
at 60 years confinement on the manufacturing offense and 10 years confinement
on the possession offense.  The trial
court sentenced appellant accordingly and ordered that the sentences run
concurrently.  We affirm.








                                                                  Issues
Presented

Appellant presents two issues for review.  In his first issue, he challenges the legal
sufficiency of the evidence to support his conviction for manufacture of
methamphetamine.  In his second issue, he
complains that the trial court erred in admitting evidence of an extraneous
offense during the punishment phase of the trial.

                                                          Sufficiency
of the Evidence

In a legal sufficiency review, we view all of the
evidence in the light most favorable to the verdict and then determine whether
a rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307 (1979); Jackson v. State, 17 S.W.3d 664
(Tex.Cr.App.2000).  The jury, as the
trier of fact, was the sole judge of the credibility of the witnesses and of
the weight to be given their testimony. 
TEX. CODE CRIM. PRO. ANN. arts. 
36.13 & 38.04 (Vernon 1979 & 1981). 

                                                                  Evidence
at Trial

The State called four witnesses during the
guilt/innocence phase of the trial: (1) Department of Public Safety Trooper
Jason Shea; (2) Department of Public Safety Narcotics Officer Sergeant James C.
Rhodes; (3)  Texas Ranger David Hullum;
and (4) Department of Public Safety Chemist Joel Budge.  Appellant did not present any witnesses
during the guilt/innocence phase of the trial. 

On June 25, 2001, Trooper Shea was working patrol
with Trooper Foster in the eastbound lanes of Interstate 20 between Cisco and
Eastland.  Appellant was driving a
vehicle in front of them. After appellant committed a traffic offense, Trooper
Shea activated his emergency lights to stop appellant.  Appellant pulled over to the shoulder of the
road, stopped his vehicle, and got out of the vehicle.








Trooper Shea got out of the patrol car and
approached appellant=s
vehicle.  Appellant gave Trooper Shea his
driver=s
license.  Appellant had a passenger,
Michael Steddum, and a pit bull dog in the vehicle.  The dog was barking and very protective of
the vehicle.  Appellant and Steddum gave
conflicting stories as to where they had been and where they were going.  Appellant told Trooper Shea that he was
buying the vehicle from two individuals. 
Trooper Shea testified that appellant was extremely nervous and would
not make eye contact with him.  Appellant
was constantly moving around and would not stand still.  Trooper Shea said that people who are nervous
and fail to make eye contact might be involved in some type of criminal
activity.

Based on the way that appellant and Steddum were
acting and their conflicting stories, Trooper Shea and Trooper Foster thought
that appellant and Steddum were involved in some type of criminal
activity.  Trooper Shea told appellant
that he was going to receive a warning for the traffic offense that he had
committed.  Appellant did not calm down
and continued to be extremely nervous. 
Appellant did not have insurance for the vehicle and the registration
for the vehicle had expired. Trooper Shea arrested appellant for the failure to
have insurance and the expired registration. 
Trooper Shea read appellant his Miranda[1]
rights and placed him in handcuffs.         
           Appellant asked whether
Steddum could take the vehicle, but Trooper Shea said that he was  going to conduct a search of the vehicle
incident to the arrest.  Appellant told
Trooper Shea that there was nothing illegal in the vehicle, not to search the
vehicle, and that the dog would bite him if he searched the vehicle.  Trooper Shea and Trooper Foster decided to
let appellant tie the dog to a tree that was on a hill by the highway.  Steddum put a leash on the dog.  Trooper Foster took the handcuffs off of
appellant, and appellant took the dog and tied it to the tree.  Trooper Shea approached the vehicle, and
Trooper Foster watched appellant and the dog. 
Trooper Foster could not see appellant after appellant tied the dog to
the tree.  Trooper Foster ran up the
hill, saw that appellant was running away, and chased appellant.  Trooper Shea stayed with Steddum and placed
him in handcuffs.  Trooper Shea called
appellant=s escape
into dispatch, and a manhunt involving many law enforcement agencies ensued. 








            Trooper Shea then conducted a search of appellant=s vehicle.  When Trooper Shea opened the back hatch of
appellant=s
vehicle, he smelled a strong odor of anhydrous ammonia.  Trooper Shea had experience and  training in the area of narcotics
investigations.  He said that anhydrous
ammonia was one of the elements used to manufacture methamphetamine during a process
called chemical synthesis.  During the
search, Trooper Shea found items commonly used in the manufacturing process,
including coffee filters and a Dr. Pepper bottle containing a powdery
substance.  Trooper Shea said that the
powdery substance in the Dr. Pepper bottle was an after-product of the
manufacturing of methamphetamine.

Sergeant Rhodes arrived on the scene and assisted
in the search.  Trooper Shea and Sergeant
Rhodes found a Mason jar containing a clear liquid with a white powdery
substance in it.  They believed that the
substance was methamphetamine.  They also
found items commonly used in connection with manufacturing methamphetamine
including coffee filters, two propane tanks that had been modified to hold
anhydrous ammonia, and many types of surveillance equipment.  Trooper Shea said that, in his experience,
manufacturers of methamphetamine use surveillance equipment to watch for
police.

Trooper Shea said that the methamphetamine in the
Mason jar had been manufactured with a process called chemical synthesis.  The officers seized the methamphetamine when
it was in a liquid form and, therefore, not ready for ingestion.  Thus, the officers seized the methamphetamine
during the middle of the manufacturing process. 
The manufacturing process could have been completed by burning the
liquid off of the methamphetamine. 
During the search, Trooper Shea and Sergeant Rhodes found a Coleman
stove that could have been used for this purpose.

Trooper Shea took the seized items to the DPS
crime laboratory in Abilene for analysis. 
Trooper Shea identified the seized items during his testimony.  State=s
Exhibit No. 1 was the Dr. Pepper bottle; State=s
Exhibit No. 2 was the Mason jar containing the methamphetamine; and State=s Exhibit No. 3 was the coffee
filters.  Trooper Shea said that his
investigation revealed that appellant had been cooking methamphetamine before
getting stopped on the highway.

The law enforcement personnel did not find
appellant during the manhunt.  Appellant
was arrested about a month later.








Sergeant Rhodes testified that he investigates
narcotics offenses for the DPS.  He is
knowledgeable about methamphetamine manufacturing processes and the types of
methamphetamine distributed throughout the state.  Trooper Shea contacted him on June 25, 2001,
in reference to appellant.  He assisted
Trooper Shea in gathering the evidence. 
Sergeant Rhodes believed that the Mason jar contained methamphetamine
oil.  He noticed an ammonia odor coming
from the vehicle.  The odor of ammonia is
prominent around methamphetamine and is consistent with the chemical synthesis
of methamphetamine.  Sergeant Rhodes said
that he and Trooper Shea found a number of items used in manufacturing
methamphetamine, including cooking utensils that would have been used to stir
different solutions, steel tanks used to carry anhydrous ammonia, and coffee
filters.  The coffee filters were
stained, but not with coffee stains. 
Sergeant Rhodes thought that the coffee filters had been used to sift
ephedrine B an
ingredient in methamphetamine B
from pill coatings.  He believed that the
propane stove had been used in a process to speed up the manufacturing of the
methamphetamine.  Sergeant Rhodes said
that the Dr. Pepper bottle would have been used as a generator in the final
stages of processing the methamphetamine. 
He also said that the methamphetamine oil in the Mason jar was in the
middle stages of the manufacturing process.

Ranger Hullum had experience and training in the
area of narcotics investigations.  Ranger
Hullum picked up the evidence from the Abilene crime lab and took it to the DPS
crime lab in Austin for testing.

Chemist Budge is a drug analyst for the DPS in
Austin.  He has worked for the DPS for 22
years.  He testified that Ranger Hullum
brought the evidence to the DPS crime lab in Austin.  Chemist Budge explained chemical synthesis.  He said that chemical synthesis is the
manufacturing or the making of a controlled substance, such as methamphetamine,
either from mixing two components to make one substance or removing a component
from a substance to make another substance. 
Pseudoephedrine, lithium, and ammonia are used in the manufacturing of
methamphetamine by chemical synthesis. 
Coffee filters are commonly used to separate ingredients in the
manufacturing of methamphetamine.

Chemist Budge analyzed the contents of the Mason
jar.  The Mason jar contained 122.45
grams of a solution containing methamphetamine. 
Chemist Budge said that the methamphetamine was not a finished product
in that it was not ready for ingestion. 
Additional manufacturing would have been necessary to make it a finished
product.  The analysis of the Dr. Pepper
bottle indicated that it contained pseudoephedrine.  The substance found in the Dr. Pepper bottle
was consistent with the manufacturing of the methamphetamine that was found in
the Mason jar.  The coffee filters were
also consistent with the manufacturing of methamphetamine.  Chemist Budge said that the items found in
appellant=s vehicle
basically constituted a methamphetamine lab. 
Chemist Budge gave the evidence back to Ranger Hullum before trial.








                                                                        Analysis

The State had the burden to prove beyond a
reasonable doubt that appellant knowingly manufactured methamphetamine in an
amount of 4 grams or more but less than 200 grams. TEX. HEALTH & SAFETY
CODE ANN. '
481.112(a) & (e) (Vernon 2003).  AManufacture@
is defined as the production, preparation, propagation, compounding,
conversion, or processing of any controlled substance other than marihuana by
the extraction from substances of natural origin, chemical synthesis, or the
combination thereof.  TEX. HEALTH &
SAFETY CODE ANN. '
481.002(25) (Vernon Supp. 2005).

Appellant asserts that, during the search of his
vehicle, the police officers did not find the quantity of chemicals necessary
to manufacture the amount of methamphetamine charged in the indictment.  Appellant argues that, because the State failed
to prove that he was in possession of sufficient ingredients necessary to
manufacture the amount of methamphetamine charged in the indictment, the
evidence was legally insufficient to support his manufacturing conviction.  In support of his argument, appellant
cites  Goff v. State, 777 S.W.2d
418 (Tex.Cr.App.1989), and Brumit v. State, 42 S.W.3d 201 (Tex.App. -
Fort Worth 2001, pet=n
ref=d). 


In Goff, police officers seized 15.2 grams
of methamphetamine and various chemicals used for manufacturing methamphetamine
during a search of the defendant=s
mobile home.  Goff v. State, supra
at 419.  The State sought to prove that
the defendant had manufactured 400 grams or more of methamphetamine. The Court
of Criminal Appeals explained that, because the seized methamphetamine was in
the final stages of production, the evidence would have supported a jury
finding that 15.2 grams of methamphetamine had been manufactured.  Goff v. State, supra at
420.  In Goff, however, the State
failed to present evidence that the defendant had been in possession of
sufficient chemicals necessary for the manufacture of 400 grams or more of methamphetamine.  The Court of Criminal Appeals held that, in
the absence of such proof, the evidence was legally insufficient to support a
conviction for manufacturing methamphetamine of an aggregate weight of 400 grams
or more.   Goff v. State, supra  at 420.    









In Brumit, police officers seized coffee
filters containing .34 grams of methamphetamine, containers with trace amounts
of methamphetamine, and empty containers that had held ingredients for
manufacturing methamphetamine.  Brumit
v. State, supra at 203.  The
State sought to prove that the defendant manufactured 4 or more grams of
methamphetamine.  The State proved that
.34 grams of methamphetamine had been found and attempted to prove the
remaining amount of meth-amphetamine based on the empty containers.  The State presented evidence that the empty
containers would have contained 528 pseudoephedrine tablets and that 4 or more
grams of methamphetamine could have been made from that number of tablets.  Brumit v. State, supra at
203-04.  The court found that the
empty-container evidence did not show that the defendant actually had been in
possession of a sufficient amount of ingredients to produce at least 4 grams of
methamphetamine.  Therefore, the court
held that the evidence was legally insufficient to support the defendant=s conviction for manufacturing 4 or
more grams of methamphetamine.  Brumit
v. State, supra at 204.       Goff and Brumit are factually
distinguishable from this case.  In Goff
and Brumit, police officers seized quantities of methamphetamine, and
the State sought to prove that the defendants had manufactured additional
amounts of methamphetamine.  In this
case, the officers seized 122.45 grams of methamphetamine.  The State did not seek to prove that
appellant manufactured a higher quantity of methamphetamine.  Rather, the State sought to prove that
appellant manufactured 4 grams or more but less than 200 grams of
methamphetamine.  Appellant was in
possession of the 122.45 grams of methamphetamine and items used for
manufacturing methamphetamine when he was stopped by Trooper Shea.  A strong odor of anhydrous ammonia was
present.  The evidence showed that the 122.45
grams of methamphetamine were in the middle stages of the manufacturing
process.  Because the methamphetamine
seized was in the middle stages of production, the evidence supports a jury
finding that appellant had manufactured 122.45 grams of methamphetamine.  Goff v. State, supra at
420.  The evidence was legally sufficient
to support appellant=s
conviction for manufacturing methamphetamine in the amount of 4 grams or more
but less than 200 grams.  Appellant=s first issue is overruled.

                                   Evidence
of Extraneous Offense During Punishment Phase

In his second issue, appellant argues that the
trial court erred in admitting evidence of an unadjudicated extraneous offense
during the punishment phase of the trial. 
The charged extraneous offense arose from a search of appellant=s residence on June 26, 2001, the day
after appellant committed the offenses in this cause.  Based on the results of the search, the State
charged appellant








in another cause number with manufacturing and possessing more
than 400 grams of meth-amphetamine.  The
trial court permitted the State to present evidence concerning the results of
the search.

Appellant argues that the trial court should have
excluded the evidence relating to the extraneous offense because (1) the State
failed to establish that he possessed, at his residence, sufficient ingredients
to manufacture 400 or more grams of methamphetamine and (2) the unfair
prejudice of the evidence substantially outweighed its probative value under
TEX.R.EVID. 403.  Appellant=s first argument is based on Goff
and Brumit.  During the search of
appellant=s
residence, law enforcement personnel found items used in the manufacturing of
methamphetamine, including salts, acetone, denatured alcohol, a gas cylinder,
Mason jars with liquid solutions containing meth-amphetamine, a blender used to
crush up tablets, a hose used to process the methamphetamine, and a milk carton
containing pseudoephedrine.  One of the
Mason jars contained 470 grams of a liquid solution containing
methamphetamine.  The law enforcement
personnel essentially discovered a methamphetamine lab during the search of
appellant=s
residence.  The 470 grams of
methamphetamine seized were in the middle stages of the manufacturing process,
similar to the methamphetamine seized from appellant=s
vehicle.  The State charged appellant
with the extraneous offense of manufacturing 400 or more grams of
methamphetamine.  Thus, Goff and Brumit
are distinguishable for the reasons stated above.  The evidence was sufficient to establish that
appellant manufactured 400 or more grams of methamphetamine.

Appellant asserts that the admission of the
extraneous offense evidence was so prejudicial that it should have been
excluded under Rule 403.  TEX. CODE CRIM.
PRO. ANN. art. 37.07, '
3(a)(1) (Vernon Pamph. Supp. 2005), provides in part that, during the
punishment phase, the State may offer evidence:

[A]s
to any matter the court deems relevant to sentencing, including but not limited
to the prior criminal record of the defendant, his general reputation, his
character, an opinion regarding his character, the circumstances of the offense
for which he is being tried, and, notwithstanding Rules 404 and 405, Texas
Rules of Evidence, any other evidence of an extraneous crime or bad act that is
shown beyond a reasonable doubt by evidence to have been committed by the
defendant or for which he could be held criminally responsible, regardless of
whether he has previously been charged with or finally convicted of the crime
or act.                            

 








The admissibility of evidence at the punishment phase of a
noncapital felony offense is a function of policy rather than relevancy.  See Rogers v. State, 991 S.W.2d 263,
265 (Tex.Cr.App.1999); Miller-El v. State, 782 S.W.2d 892 (Tex.Cr.App.1990).  Accordingly, the Texas Court of Criminal
Appeals has observed that, in assessing what is relevant to sentencing, the
important question is Awhat
is helpful to the jury in determining the appropriate sentence for a particular
defendant in a particular case.@  Rogers v. State, supra at 265.

The language of Article 37.07, section 3(a)(1),
establishes that the extraneous offense was relevant to the assessment of
appellant=s
punishment.  Punishment phase evidence
that the trial court deems relevant is still subject to a Rule 403
analysis.  See Rogers v. State, supra
at 266-67.  Under Rule 403, even relevant
evidence may be excluded if its probative value is substantially outweighed by
the danger of unfair prejudice, confusion of issues, misleading the jury,
considerations of undue delay, or needless presentation of cumulative
evidence.  Relevant evidence is only
inadmissible under Rule 403 to the extent that its degree of unfair prejudice
substantially outweighs the probative value of the evidence.  Rogers v. State, supra at
266.  AUnfair
prejudice@ refers
to Aan undue tendency to suggest [a]
decision on an improper basis.@  Rogers v. State, supra at
266.  Given the similarity of appellant=s conduct with respect to the
manufacturing offense charged in this cause and the extraneous manufacturing
offense charged, the trial court did not abuse its discretion in admitting the
evidence.  Appellant=s second issue is overruled.

                                                                This
Court=s Ruling

The judgment of the trial court is affirmed.               

 

TERRY McCALL

JUSTICE

 

December 1, 2005

Do not publish.  See
TEX.R.APP.P. 47.2(b).

Panel consists of:  Wright,
C.J., and McCall, J.

W. G. Arnot, III, retired effective July 31, 2005 and is,
therefore, not participating.

 











[1]Miranda v. Arizona, 384 U.S. 436 (1966).